UNITED STATES OF AMERICA,

         Plaintiff,

- versus -

LAWRENCE JOHNSON,

         Defendant.

MEMORANDUM
AND ORDER

98-CR-420 (JG)

JOHN GLEESON, United States District Judge:

    Lawrence Johnson moves for a modification of his sentence pursuant to 18 U.S.C. § 3582(c)(2) in light of Amendment 750 to the United States Sentencing Guidelines ("Guidelines" or "U.S.S.G."). *See* ECF No. 280. For the reasons explained below, the motion is granted. Johnson's prison sentence is hereby reduced to 324 months.

## BACKGROUND

    Johnson is currently serving a sentence of life in prison, imposed on May 5, 2000, for conspiring to distribute and to possess with intent to distribute cocaine, cocaine base, and marijuana within 1,000 feet of a public elementary school.[1] The evidence at trial established that from approximately 1993 to 1995, when he was in his early twenties, Johnson sold numerous guns to members of a drug dealing operation based on Beach 26th Street (the "Beach 26th Street ring") in the Far Rockaway section of Queens, New York. Johnson would purchase the guns at flea markets in the Tri-City area (comprising areas near the border of Tennessee and Virginia),

---

[1] *See* Am. Judgment, ECF No. 266. Johnson is also serving a concurrent term of 60 months for unlawfully selling firearms without a dealer license. *Id.* Johnson was initially sentenced to another concurrent life sentence for conspiring to distribute narcotics. *See* Judgment, ECF No. 202. However, the Second Circuit vacated this latter conviction on the ground that it was a lesser-included offense of the school count. *See* ECF No. 265. Accordingly, on remand, I dismissed the narcotics conspiracy count, leaving only the school count and the count for the illegal sale of firearms. *See* Am. Judgment, ECF No. 266.

where he lived, and drive the guns up to New York, where he would sell them for cash and cocaine, sometimes to members of the Beach 26th Street ring. Johnson would then return to the Tri-City area and sell the cocaine. Profits from Johnson's Tri-City drug sales were not shared with the Beach 26th Street ring, and profits from the Beach 26th Street ring were not shared with Johnson. Although Beach 26th Street was a one-block-long, dead-end street notorious for drug dealing, in September 1996, a public elementary school opened nearby, located roughly 489 feet away from Beach 26th Street. The Beach 26th Street ring continued dealing drugs on Beach 26th Street until the arrests of its high-level members in April 1998. By the time of Johnson's arrest in May 1998, he had stopped selling guns to the Beach 26th Street ring and had attended college and opened his own clothing store.[2]

Johnson was convicted after trial of all counts against him. His (then-mandatory) Guidelines range at the time of sentencing was life, which was based on a total offense level of 44 and a Criminal History Category of II. Johnson's total offense level was calculated as follows: His base offense level was 38 (the highest provided for in the drug-quantity table), based on the court's finding that Johnson was responsible for the sale of more than 1.5 kilograms of crack cocaine. *See* U.S.S.G. § 2D1.1 (2000); Sentencing Tr. at 40.[3] Added to the base offense level were (1) a two-level enhancement pursuant to U.S.S.G. § 2D1.2(a)(1) for distribution of narcotics near a school;[4] (2) a two-level enhancement pursuant to U.S.S.G. § 2D1.1(b)(1) for possession of a firearm during and in relation to the drug trafficking conspiracy; and (3) a two-

---

[2] The presentence investigation report ("PSR") prepared in this case confirmed that between January 1997 and April 1998, Johnson owned and operated the New York Flava Clothing Store in Johnson City, Tennessee. PSR ¶ 104. The probation department also verified in the PSR that Johnson had attended East Tennessee State University in Bristol, Tennessee, from September 1995 to May 1996. PSR ¶ 99.

[3] The Sentencing Transcript was filed as Exhibit A to Johnson's supplemental submission in support of his motion for a sentence reduction. *See* Def.'s Supp. Mem. at 18, ECF No. 296.

[4] Technically, § 2D1.2(a)(1) increased Johnson's *base* offense level by two levels – from 38 to 40. However, because it facilitates clearer discussion and does not alter the calculation, I will refer to Johnson's base offense level as the offense level produced by the drug quantity table in § 2D1.1(c), and the two-level increase based on § 2D1.2(a)(1) for distribution near a school as an enhancement.

level enhancement pursuant to § 3C1.1 for obstruction of justice based on Johnson's false testimony at trial.

In 2011, the United States Sentencing Commission adopted Amendment 750 to the Guidelines Manual, which reduced the base offense levels applicable to most crack cocaine offenses. *See* U.S.S.G., App. C, Amend. 750 (eff. Nov. 1, 2011) (amending, *inter alia*, the drug quantity table in U.S.S.G. § 2D1.1(c)); *see also id.* Amend. 759 (making Amendment 750 applicable retroactively). Now, a defendant must be responsible for the sale of at least 8.4 kilograms of crack cocaine to trigger a base offense level of 38 – the highest level provided for in the drug quantity table. *See* U.S.S.G. § 2D1.1(c). A quantity between 2.8 and 8.4 kilograms yields a base offense level of 36, and a quantity between 840 grams and 2.8 kilograms translates into a base offense level of 34. *Id.* Thus, the threshold quantity required to trigger a base offense level of 38 when Johnson was originally sentenced – 1.5 kilograms – now produces a base offense level of only 34. *Id.*

DISCUSSION

A.  *The Governing Legal Standards*

1.  *The Court's Power To Reduce a Previously Imposed Term of Imprisonment*

18 U.S.C. § 3582(c) prohibits a court from modifying a term of imprisonment after it has been imposed except, *inter alia*, that

> in the case of a defendant who has been sentenced to a term of imprisonment based on a sentencing range that has subsequently been lowered by the Sentencing Commission pursuant to 28 U.S.C. 994(o), upon motion of the defendant or the Director of the Bureau of Prisons, or on its own motion, the court may reduce the term of imprisonment, after considering the factors set forth in section 3553(a) to the extent that they are applicable, if such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.

3

18 U.S.C. § 3582(c)(2); *see also United States v. Rivera*, 662 F.3d 166, 170 (2d Cir. 2011) ("Section 3582(c)(2) grants courts the authority to reduce sentences only if doing so is consistent with the Commission's applicable policy statements.").

The Sentencing Commission's "applicable policy statement[]" appears in U.S.S.G. § 1B1.10(a), which provides that where "the guideline range applicable to [a defendant serving a term of imprisonment] has subsequently been lowered as a result of an amendment to the Guidelines Manual listed in subsection (c) below,[5] the court may reduce the defendant's term of imprisonment as provided by 18 U.S.C. § 3582(c)(2)." The same subsection is explicit, however, that "[a] reduction in the defendant's term of imprisonment is *not* consistent with this policy statement and therefore is *not* authorized under 18 U.S.C. § 3582(c)(2) if . . . [the Guidelines amendment] does not have the effect of lowering the defendant's applicable guideline range." U.S.S.G. § 1B1.10(a)(2)(B) (emphasis added); *accord Rivera*, 662 F.3d at 171 ("[E]ligibility for a sentence reduction 'under 18 U.S.C. § 3582(c)(2) is triggered only by an amendment listed in subsection (c) [of § 1B1.10] that lowers the applicable guideline range.'" (quoting U.S.S.G. § 1B1.10 cmt. n.1(A)) (alterations in original)).

The Guidelines further make clear that in determining whether Amendment 750 has the effect of lowering Johnson's applicable guideline range, the court must "substitute only [Amendment 750] for the corresponding guideline provisions that were applied when the defendant was sentenced and shall leave all other guideline application decisions unaffected." U.S.S.G. § 1B1.10(b)(1). In other words, a defendant is eligible to have his sentence reduced only if the amended guideline produces a lower sentencing range than did the corresponding guideline under which he was sentenced, holding constant all other guideline application

---

[5] Amendment 750 (in relevant part) is listed in subsection (c) as one of the amendments covered by this policy statement. *See* U.S.S.G. § 1B1.10(c).

4

decisions made at the time of sentencing. This restriction on my ability to modify a sentence is mandatory, as § 3582(c)(2) "authorize[s] only a limited adjustment to an otherwise final sentence and not a plenary resentencing proceeding." *Dillon v. United States*, 130 S. Ct. 2683, 2691 (2010).

2. *The Meaning of "Relevant Conduct" Under the Guidelines*

In general, a court must consider all "[r]elevant [c]onduct" when determining a defendant's Guidelines range. U.S.S.G. § 1B1.3. Relevant conduct includes the defendant's own acts and omissions (and the acts of others the defendant aided or abetted) that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense. *Id.* § 1B1.3(a)(1)(A). In addition, when the defendant has undertaken a criminal activity together with others, he is held accountable for "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity." *Id.* § 1B1.3(a)(1)(B).

"In order to hold a defendant accountable for the acts of others [under U.S.S.G. § 1B1.3(a)(1)(B)], a district court must make two findings: 1) that the acts were within the scope of the defendant's agreement and 2) that they were foreseeable to the defendant." *United States v. Johnson*, 378 F.3d 230, 238 (2d Cir. 2004) (quoting *United States v. Studley*, 47 F.3d 569, 574 (2d Cir. 1995)); *see also* U.S.S.G. § 1B1.3 cmt. n.2 (relevant conduct includes the conduct of others only if it was "*both* in furtherance of, *and* reasonably foreseeable in connection with, the criminal activity jointly undertaken by the defendant" (emphasis added)).[6] These determinations must be made sequentially: The sentencing court "'must *first* determine the scope of the criminal

---

[6] Application Note 2 goes on to provide that "[w]ith respect to offenses involving contraband (including controlled substances), the defendant is accountable for all quantities of contraband with which he was directly involved and, in the case of a jointly undertaken criminal activity, all reasonably foreseeable quantities of contraband that were within the scope of the criminal activity that he jointly undertook." U.S.S.G. § 1B1.3 cmt. n.2.

activity the particular defendant agreed to jointly undertake' . . . *before* the issue of foreseeability, prong two, is reached." *Studley*, 47 F.3d at 574 (quoting U.S.S.G. § 1B1.3 cmt. n.2) (emphasis added). Both stages require particularized findings. *Studley*, 47 F.3d at 574 (holding that the sentencing court must "make a particularized finding of the scope of the criminal activity agreed upon by the defendant," and then "make a particularized finding as to whether the activity was foreseeable to the defendant").

The scope of the criminal venture jointly undertaken by a defendant is by no means necessarily co-extensive with the scope of the entire criminal conspiracy. U.S.S.G. § 1B1.3 cmt. n.2. "Hence relevant conduct is not necessarily the same for every participant" in a conspiracy. *Id.* To determine the scope of the criminal activity that a particular defendant agreed to jointly undertake, the court must discern "the scope of the specific conduct and objectives embraced by the defendant's agreement." *Studley*, 47 F.3d at 574 (quoting U.S.S.G. § 1B1.3 cmt. n.2). To do so, "the court may consider any explicit agreement or implicit agreement fairly inferred from the conduct of the defendant and others." U.S.S.G. § 1B1.3 cmt. n.2. That the defendant is aware of the scope of an overall operation of which he is a part is not enough to hold him accountable for the activities of the entire operation; rather, the "relevant inquiry is what role the defendant agreed to play in the operation, either by an explicit agreement or implicitly by his conduct." *Studley*, 47 F.3d at 575 (citing U.S.S.G. § 1B1.3, cmt. n.2 illus.(c)(7)); *see also Johnson*, 378 F.3d at 238 (mere knowledge of murder committed by co-conspirator insufficient even where it was within scope of overall operation; murder must be within scope of specific conduct and objectives agreed to by defendant). Shared membership in a conspiracy is not enough to hold the defendant accountable for all acts taken by the other conspirators; courts require evidence that the defendant has pooled his profits or resources with

the other participants or otherwise "directly tied" his success to the activities of the others, or has not only assisted in the execution of the illegal scheme but in its design as well. *See Studley*, 47 F.3d at 575 (citing U.S.S.G. § 1B1.3, cmt. n.2 illus.(c)(2), (c)(6)).

Morevoer, "[w]hen the Guidelines allow for punishment of relevant conduct as though it were convicted conduct, [the sentencing court] ha[s] a special obligation to ensure that the evidence of relevant conduct is solid." *United States v. Archer*, 671 F.3d 149, 165 (2d Cir. 2011) (citing *United States v. Shonubi* ("*Shonubi IV*"), 103 F.3d 1085, 1089 (2d Cir. 1997)). "[Q]uantity-based enhancements for relevant conduct" must be based on "'*specific evidence*' that the offense involved the requisite quantity of items." *Id.* at 162 (emphasis added). Specific evidence can be found in drug records, admissions by the defendant, or live testimony. *Shonubi IV*, 103 F.3d at 1089. However, proving the quantity of narcotics trafficked over eight trips by multiplying by eight the amount smuggled during the offense of conviction amounted only to "surmise" and "conjecture," and thus was impermissible. *United States v. Shonubi* ("*Shonubi II*"), 998 F.2d 84, 89-90 (2d Cir. 1993). Proving quantity by statistical analyses relating to drug trafficking generally and not the defendant specifically similarly fails to qualify as "specific evidence." *Shonubi IV*, 103 F.3d at 1092.

B.  *Johnson's Eligibility for a Sentence Reduction*

I found at Johnson's sentencing that members of the conspiracy of which he was a member sold "far more" than 1.5 kilograms of crack cocaine, and that those sales were reasonably foreseeable to Johnson and within the scope of his jointly undertaken criminal activity. Sentencing Tr. at 40. In the alternative, I found that Johnson received more than 1.5 kilograms of crack cocaine in exchange for the guns that he sold to members of the conspiracy. *Id.* at 41. Because 1.5 kilograms of crack marked the top end of the drug quantity table at the

time of Johnson's sentencing, I had no occasion to, and did not, make any finding of drug quantity greater than 1.5 kilograms.

In making my Guidelines calculations in this case, I am limited to considering only relevant conduct that has been proved by "specific evidence." *Archer*, 671 F.3d at 162; *Shonubi IV*, 103 F.3d at 1089. This is because the drug quantity finding driving Johnson's Guidelines range goes beyond his convicted conduct. The jury at Johnson's trial found through a special verdict form that he was responsible for the distribution at least 50 grams of crack cocaine. Def.'s Supp. Mem. at 2, ECF No. 296 (citing Trial Tr. 1870; Jury Note #9). The jury did not ascribe responsibility to Johnson for any quantity greater than 50 grams. In addition, because the only count on which Johnson's life sentence rests is his conviction for narcotics distribution within 1,000 feet of a school, only crack cocaine sales made *after* the school opened in September 1996 constitute offense conduct.[7]

1.  *Jointly Undertaken Criminal Conduct*

When considering Johnson's responsibility for the crack cocaine sales made by other members of the conspiracy, I first must determine the scope of his jointly undertaken criminal activity. Johnson may not be held responsible for sales of crack cocaine that were outside the scope of his jointly undertaken criminal activity, even if they were foreseeable to him. The evidence both at Johnson's trial and at his sentencing indicated that although Johnson

---

[7] There is a discrepancy in the record regarding the time period of Johnson's dealings with the Beach 26th Street ring. Shannon Hale, a friend of Johnson's from high school who accompanied Johnson on a few of his trips to New York, testified at trial that Johnson's trips occurred between 1993 and 1995. Def.'s Supp. Mem. at 2; PSR ¶ 35. The defense contends that no evidence was presented at trial of interactions between Johnson and the Beach 26th Street ring after 1995. *Id.* If this is so, then *all* of Johnson's interactions with the conspiracy predated the opening of the public school in September 1996, and thus none of his personal acts constituted offense conduct. However, at sentencing, David Hamilton testified that Johnson's gun sales spanned the period from the summer of 1995 until 1998. *See* Sentencing Tr. at 8, 15. Johnson's brother, Andrew Johnson, also told an FBI agent that he had accompanied Johnson on trips to New York beginning in the summer of 1995. *Id.* at 10. Andrew, however, had no knowledge of Johnson's activities after February 1996, because Andrew had been incarcerated since then. *Id.* at 11. Andrew recanted his statements inculpating his brother when he was called to testify at Johnson's sentencing. *Id.* at 22.

8

was an important member of the conspiracy, his involvement was unique; while he periodically sold guns to the group, he never himself sold drugs (or supervised the selling of drugs) on Beach 26th Street. Moreover, he did not pool his profits or resources with the Beach 26th Street ring, nor in any other way "directly tie" his success with theirs. His role was limited to being a gun supplier, who was sometimes remunerated in drugs. As I ruled at Johnson's trial, this involvement was sufficient to render him a co-conspirator under the law. *See Direct Sales Co. v. United States*, 319 U.S. 703, 711 (1943) (holding that seller qualifies as co-conspirator so long as the "seller knows the buyer's intended illegal use" and "by the sale [the seller] intends to further, promote and cooperate in it"); *United States v. Falcone*, 311 U.S. 205, 210-11 (1940). However, as explained above, the criminal activity that Johnson jointly undertook for purposes of determining his relevant conduct under the Guidelines is not necessarily co-extensive with the scope of the entire conspiracy. Thus, the scope of conduct of others for which he may be held accountable for Guidelines range–computation purposes can be considerably narrower than the scope of such conduct for which he can be held criminally responsible.

At sentencing, I concluded that Johnson was an "integral" member of the drug operation, based on his "sustained nexus to the conspiracy over a period of years" and the fact that Johnson intended to promote the success of the conspiracy to further his own livelihood. Sentencing Tr. at 43. I concluded that he was more culpable than a typical supplier of materials because he supplied firearms to a serious crack cocaine distribution business "with [his] eyes wide open knowing the risks that [he] faced." *Id.* at 48. I therefore concluded that some of the cocaine distribution of the Beach 26th Street ring could be attributed to him. However, I did not make a specific finding as to the particular scope of the criminal activity that he jointly undertook. I merely concluded that more than 1.5 kilograms of sales were both part of his jointly

undertaken criminal activity and foreseeable to him. This was error. I should have made a particularized finding of the scope of the criminal activity that he jointly undertook. The recent retroactive amendments to the Guidelines' treatment of crack cocaine offenses have placed that error in clearer relief, and require more nuanced facfindings than I made in the past.

Johnson did not jointly undertake the full scope of the conspiracy. The application notes to § 1B1.3 place great significance on the *independence* of the defendant from the other conspirators in determining the scope of the jointly undertaken criminal activity. *See* U.S.S.G. § 1B1.3 cmt. n.2 illus.(c)(4), (c)(6). Johnson consistently maintained his independence from the Beach 26th Street ring. He did not sell drugs on Beach 26th Street himself. He did not supervise or get supervised by any other members of the conspiracy. He did not take part in designing any aspect of the Beach 26th Street ring's drug-selling operation; his role was limited to providing assistance to that operation. *See Studley*, 47 F.3d at 575 (citing U.S.S.G. § 1B1.3, cmt. n.2 illus.(c)(2)). He did not pool his profits or resources with the Beach 26th Street ring. *See Studley*, 47 F.3d at 575 (citing U.S.S.G. § 1B1.3, cmt. n.2 illus.(c)(6)). Although he benefitted from the success of the Beach 26th Street ring in the sense that it provided him with a steady business and reliable clientele, his success was not "directly tied" to it; he did not possess an equity interest in the operation or in any other way derive a direct benefit from its success. He benefitted only as any business benefits from the large volume purchases of another successful business.

In selling guns to the members of the conspiracy, Johnson acted more like an independent contractor than a joint venturer. Testimony from the government's primary witness, David Hamilton, suggested that Johnson's deliveries were *ad hoc* and did not follow an agreed-upon schedule. Johnson would merely appear from time to time in New York with guns, and

from time to time sell those guns to the Beach 26th Street ring. The evidence did not show that Johnson made commitments regarding future deliveries or that he was held accountable by the Beach 26th Street ring for a specific quantity of deliveries; indeed, during some intervals, Johnson would simply not appear for months, without facing any adverse consequences from the Beach 26th Street ring. He was not made to answer for his absences. Significant (even exclusive) gun sales to the Beach 26th Street ring do not on their own render Johnson a joint undertaker of the Beach 26th Street ring's drug dealing activities.

Nor do Johnson's subsequent resales of the drugs near the Tennessee-Virginia border constitute jointly undertaken activity. Hamilton testified that Johnson's drug sales down south were not part of the Beach 26th Street ring's activities. Def.'s Supp. Mem. at 2 (citing Trial Tr. 1221-1223). Although none of the Guidelines' illustrations is exactly on point, Johnson appears more to resemble a purchaser who benefits from the group's activities but operates independently of them, as described in illustration (c)(4) of Application Note 2 of the commentary to U.S.S.G. § 1B1.3, than a joint participant in the Beach 26th Street ring's activities. Independence predominates here; any interdependence between Johnson and the Beach 26th Street ring is merely indirect and circumstantial and does not extend beyond serial business transactions between a supplier and high-volume purchaser.

Moreover, although Johnson failed to "withdraw" from the conspiracy in the legal sense of the word, the evidence at trial indicated that at some point he ceased dealings with the Beach 26th Street ring. The jury seemed troubled that Johnson would be held accountable for the actions of the drug operation after he stopped his dealings with them. During its deliberations, the jury sent a note inquiring whether, if guns were sold to conspirators before September 1996, and the conspirators continued to be part of the conspiracy, the seller of the

11

guns is also part of the conspiracy after September 1996. Def.'s Supp. Mem. at 2 (citing Jury Note #5; Trial Tr. 1833-1842). This suggests a wariness of attributing the later activities of the Beach 26th Street ring to Johnson. A second note asked whether a defendant who was guilty of the drug conspiracy but was not proved to participate after September 1996 could still be convicted of the school count. Def.'s Supp. Mem. at 2 (citing Jury Note #7; Trial Tr. 1846-1868). I responded by instructing the jury on conspiracy law and the legal requirements for withdrawal. *Id.* After receiving that instruction, the jury convicted Johnson of the three charges against him – including the school count. Although Johnson's lack of participation after 1995 failed to qualify as withdrawal under the law, Guidelines calculations are more refined, and the government's trial evidence failed to prove that the scope of his jointly undertaken criminal activity extended beyond that time.

I conclude that the drug sales made by the Beach 26th Street ring were generally outside the scope of the criminal activity that Johnson jointly undertook. Although some of the sales may have been embraced by Johnson's implicit agreement to generally keep the group supplied with guns, I am unable to make a particularized finding of the scope of this jointly undertaken activity beyond the 1.5 kilogram finding that I made at the time of Johnson's sentencing in 2000. Accordingly, I am unable to hold Johnson accountable for more than 1.5 kilograms of crack cocaine sales as part of his jointly undertaken criminal conduct.

2. *Johnson's Own Conduct*

As an alternative basis for determining his base offense level in 2000, I found that Johnson had himself personally received more than 1.5 kilograms of crack cocaine in consideration for his gun sales, and thus that quantity was fairly attributable to him as relevant conduct under U.S.S.G. § 1B1.3(a)(1)(A).

At sentencing, I credited David Hamilton's testimony in holding Johnson responsible for at least 1.5 kilograms of crack cocaine. Hamilton testified that he met Johnson sometime in the summer of 1995, and that for a period after that Johnson would come up to "see [Hamilton] to pick up narcotics." Sentencing Tr. at 16. Hamilton "never calculated the number of months" that these dealings continued, but he estimated the period spanned "many months, couple of years." Sentencing Tr. at 16-17. Hamilton estimated that Johnson came "[d]ifferent times," "maybe once every two weeks," "[s]ometimes every week," "sometimes twice a month." *Id.* at 16-17. However, there were periods during which he did not see Johnson at all, such as in 1996 for approximately six months "or something like that" when he presumed Johnson was incarcerated. *Id.* at 19. An FBI agent who had interviewed Hamilton related that Hamilton had told him that in addition to this six-month period in 1996, "[t]here was also a period of two months Mr. Hamilton did not see Mr. Johnson there to make a purchase," and "there were other times Mr. Hamilton was not in the area." *Id.* at 8. When pressed to give a specific number, Hamilton testified that he had met with Johnson about "64 times." *Id.* at 19. However, he admitted that he had just calculated that number by doing arithmetic in his head based on the rough figures he had already provided – he had no specific knowledge supporting his statement that there were 64 visits. *Id.*

Hamilton testified that on these occasions when he encountered Johnson, he would transfer to him "sometimes between four and a half to nine ounces" of cocaine, which was "[s]omtimes regular cocaine" and sometimes crack cocaine. *Id.* at 17-18. He estimated that the cocaine was in powder form about 10 percent of the time. *Id.* at 18. Hamilton testified that he

13

did not keep any records of his dealings with Johnson and was relying on only his memory; he emphasized that his estimations were just "approximate[]" – "it's not accurate." *Id.* at 19.[8]

Although these rough estimates permitted me to conclude by a preponderance that Johnson was responsible for purchasing more than 1.5 kilograms of crack cocaine, I find that Hamilton's testimony is too rough and speculative to permit a finding greater than that. Hamilton's description of his drug sales to Johnson is "long on generalities and broad-ranging estimates but short on specifics and precision." *See United States v. Hall*, 582 F.3d 816, 818 (7th Cir. 2009) (criticizing reliance on such general evidence, even where the estimates were broken up into specific time periods, with specific quantity estimates assigned to each period). Although Hamilton generally assured defense counsel that he had accounted in his calculations for the periods during which he did not see Johnson on a regular basis, Hamilton provided no reason to believe that he had carefully counted up his interactions with Johnson or excised these time periods of extended absence from his estimate in any methodological way.

When determining the drug quantity for which a defendant is responsible at sentencing, I am counseled to use "a minimum figure, derived from a conservative method that g[ives] every benefit of the doubt" to the defendant. *See United States v. Prince*, 110 F.3d 921, 925 (2d Cir. 1997). Using the low-end of the figures that Hamilton supplied, Johnson would be responsible for approximately 4.13 kilograms of crack cocaine.[9] However, I find that this figure

---

[8] Hamilton's testimony at trial provided no such detail regarding his dealings with Johnson, and indicated only that Rafael Garcia bought three guns from Johnson in exchange for a total of 62.5 grams of crack cocaine. Def. Supp. Mem. at 9 (citing Trial Tr. 1025-1026).

[9] The defense approximated this "low end" estimate from Hamilton's testimony. *See* Def.'s Supp. Mem. at 9 & n.1. Defense counsel arrived at this figure by the following calculation: 18 months x 2 visits per month x 4.5 ounces of cocaine per visit x 90% of cocaine in crack form = 4.13 kilograms crack. (1 ounce is about 28.35 grams.) The government suggested slightly different inputs to calculate a "lowest end" estimate from Hamilton's testimony: 64 occasions x 4.5 ounces per visit x 90% crack. *See* Gov't Supp. Mem. at 3, ECF No. 299. Using these inputs, the low-end estimate would be 7.348 kilograms. (The government instead argues that these inputs produce a total of 7.399 kilograms, because it multiplies the 90% figure by the number of occasions and then rounds upward, rather than multiplying the 90% figure by the total amount of cocaine. This unnecessary assumption leads the

is not supported by the requisite "specific" and "solid" evidence needed to support a quantity-based increase in Johnson's offense level.

Although Hamilton was generally credible in his testimony regarding his dealings with Johnson, his quantity estimates lacked the precision necessary to qualify as specific and solid evidence. He admitted he kept no records of any sort and was merely relying on his memory regarding transactions that occurred from between three to five years before. Sentencing Tr. at 19. He did not disaggregate his quantity estimates by time period, even though they spanned multiple years and included time periods during which either he or Johnson were entirely absent for long periods of time. His estimates were therefore even more lacking in specificity than the estimates that were found lacking by the Seventh Circuit in *Hall*. *See* 582 F.3d at 818. In addition, although the government attempts to massage his testimony into precise formulas, Hamilton did not say that *every* time Johnson came, he received either 4.5 or 9 ounces of cocaine. Rather, he simply said that Johnson would get "*[s]ometimes* between four and a half to nine ounces." Sentencing Tr. at 17 (emphasis added). Hamilton gave no indication of how much was transferred on the occasions when the amount was not within this range. In addition, though Hamilton generally asserted "[y]es" in response to defense counsel's question of whether he had "taken . . . into [his] calculation" that Hamilton did not see Johnson "in [19]96, for six months or something like that," Hamilton provided no details regarding how he had accounted for this long period of absence in his broad estimates. In sum, Hamilton provided no solid grounding for the quantity estimates he supplied at sentencing. Although I find Hamilton credible, I do not find his testimony sufficiently specific and precise, nor supported by the requisite documentation or particularized recollections, to support a fine-grained quantity

---

government to presume that on 58 occasions Johnson received 100% crack cocaine, and on 6 occasions he received 100% powder cocaine. There is no basis in the testimony for that assumption, which effectively changes the percent of crack from 90% to 90.6%.)

determination beyond the one I made in 2000: that Johnson had received more than 1.5 kilograms of crack cocaine from the Beach 26th Street ring.[10]

3.   *Calculation of Amended Guidelines Range*

Under the amended guideline, 1.5 kilograms of crack cocaine produces a base offense level of 34. Preserving all other guideline application decisions made at the time of sentencing requires me to add 6 levels to this base offense level (as I did when Johnson was originally sentenced), producing a total offense level of 40. A total offense level of 40 combined with a Criminal History Category of II produces a Guidelines range of 324 – 405 months. This is lower than Johnson's Guidelines range at the time of sentencing, which was life. Accordingly, Johnson is eligible for a sentence modification pursuant to 18 U.S.C. § 3582(c)(2), because applying the amended guideline to him lowers his applicable Guidelines range. *See* U.S.S.G. § 1B1.10(a)(1), (a)(2)(B).

C.   *Johnson's Entitlement to a Sentence Reduction*

Having determined that Johnson is eligible for a sentence reduction, I next consider whether he is deserving of one. *See Freeman v. United States*, 131 S. Ct. 2685, 2694 (2011) (distinguishing "a defendant's eligibility for relief" from his entitlement to relief, stating that "even where a defendant is permitted to seek a reduction, the district judge may conclude that a reduction would be inappropriate"); *Rivera*, 662 F.3d at 177 ( "[A]ll we decide here is the eligibility of Rivera for a sentence reduction under § 3582(c)(2), not his entitlement to one. The

---

[10] The government argues that I already implicitly found that Johnson was responsible for more than 4.5 kilograms of crack by denying Johnson's motion for a sentence reduction in 2008. *See* Gov't Supp. Mem. at 2, ECF No. 299; *see also* ECF No. 242 (2008 order denying motion for sentence reduction). Johnson's uncounseled motion in 2008 requested a sentence reduction under a 2007 amendment to the Guidelines that increased the minimum quantity of crack cocaine required to trigger the maximum base offense level provided in the drug quantity table from 1.5 to 4.5 kilograms. *See* ECF No. 238 (Johnson's 2008 motion). I denied the motion by summary order, stating that Johnson was "neither eligible nor deserving of a sentence reduction." ECF No. 242. However, at the time of Johnson's 2008 motion, I erroneously failed to focus on the narrowness of Johnson's involvement with the Beach 26th Street ring. The assistance of appointed counsel with this subsequent motion has helped acquaint me with Johnson's unique role in the conspiracy.

16

latter question is left to the sound discretion of the district court." (citation omitted)). In determining whether and to what extent a reduction in sentence is warranted, I must consider all of the factors set forth in 18 U.S.C. § 3553(a). *See* U.S.S.G. § 1B1.10 cmt. n.1(b)(i). Although the extent of any sentence reduction is committed to the court's discretion, this discretion is bounded by the lower end of Johnson's amended guideline range. *See Rivera*, 662 F.3d at 171; U.S.S.G. § 1B1.10(b)(2)(A) ("[T]he court shall not reduce the defendant's term of imprisonment . . . to a term that is less than the minimum of the amended guideline range . . . .").

There are many factors present in this case that warrant a reduction in sentence from Johnson's current term of life. First, Johnson was relatively young at the time of the offense, and was only barely emerging from a tragic childhood. Johnson's parents divorced when he was five years old. His mother remarried less than a year later to a dangerously abusive man. PSR ¶ 88. When Johnson was seven years old, his stepfather doused him in PineSol in order to burn him. *Id.* When Johnson's mother learned what his stepfather had done, she stabbed his stepfather. *Id.* Shortly thereafter, Johnson's mother died, apparently in a fire; relatives later informed Johnson that she had been murdered by his stepfather. *Id.* ¶ 89. Johnson and his siblings began living with their grandmother, first in Queens, New York, and then in Abingdon, Virginia. *Id.* ¶¶ 89-90. In 1988, when Johnson was 15 years old, his biological father committed suicide. *Id.* ¶ 90. Johnson, who according to his grandmother was a good student and basketball player up until then, started having behavioral and academic problems around that time. Def.'s Supp. Mem. Ex. E. Johnson began selling guns during high school to make money. He had a few relatively minor run-ins with the law but never served jail time. PSR ¶¶ 67-70. Johnson graduated from high school in 1993, and started selling guns to the Beach 26th Street

17

ring when he was around 20 to 22 years old. He attended some college, and opened his own clothing store in 1997, which he was still operating at the time of his arrest. PSR ¶¶ 99, 104.

Johnson's youth at the time of the offense, especially in light of his chaotic and tragic upbringing, is a mitigating factor that reduces his culpability and increases his potential for rehabilitation. As the Supreme Court has recognized, youthful offenders often suffer from impulsivity, recklessness, susceptibility to peer pressure, and lack of control over their external surroundings – qualities that "do not disappear when the individual turns 18." *Roper v. Simmons*, 543 U.S. 551, 574 (2005). "These differences [between juveniles and adults] render suspect any conclusion that a juvenile falls among the worst offenders." *Id.* at 570; *see also Graham v. Florida*, 130 S. Ct. 2011, 2026-27 (2010) ("It remains true that '[f]rom a moral standpoint it would be misguided to equate the failings of a minor with those of an adult, for a greater possibility exists that a minor's character deficiencies will be reformed.'" (quoting *Roper*, 543 U.S. at 570)); *Johnson v. Texas*, 509 U.S. 350, 368 (1993) ("The relevance of youth as a mitigating factor derives from the fact that the signature qualities of youth are transient; as individuals mature, the impetuousness and recklessness that may dominate in younger years can subside."). Johnson's youth at the time of his offense renders suspect the conclusion that he deserves the ultimate punishment reserved for the worst offenders – life in prison.

In addition, there is no evidence that Johnson committed any acts of violence in connection with his crime. Although Johnson's criminal activity – supplying guns to a powerful drug operation – posed an intrinsic danger to the community, there is no evidence or even allegation that he personally engaged in any violence or threat of violence in the course of his criminal conduct. Johnson's lack of violence is a significant consideration under 18 U.S.C. § 3553(a) militating against his receiving the maximum possible term of imprisonment. Indeed, I

18

downwardly departed when sentencing Johnson's co-defendant Tyrone Grimes on the basis, *inter alia*, of his lack of violence in discharging his role in the drug conspiracy. *See* ECF Nos. 163 (Judgment); ECF No. 222 (Am. Judgment); ECF No. 292 (reciting reasons).

Moreover, Johnson's role in the conspiracy – although serious and undeserving of a mitigating role adjustment – counsels hesitation in imposing the maximum sentence available. The only other members of the Beach 26th Street conspiracy serving a life sentence are its two ringleaders: Garth Bruce and Carf Flaherty.[11]  Bruce was a leader and supervisor of the drug-selling business on Beach 26th Street from 1992 to 1998; he supervised at least eight people, had a prior felony conviction, possessed guns to protect his drug enterprise, and employed teenagers. PSR ¶¶ 19-21.  Flaherty was a manger in the drug operation from 1992 to 1997; he supervised more than six people, including teenagers, and participated in the murder of a rival drug dealer. PSR ¶¶ 29, 32.  Johnson, by contrast, was less involved in the drug ring, did not have a leadership role, did not recruit minors to the conspiracy, had no prior felony convictions, had never before served a term of imprisonment, and did not engage in acts of violence.

Life sentences are reserved for the worst offenders.  Johnson's youth, lack of significant criminal history, tragic childhood, lack of violence, and lack of a leadership role in this crime all counsel in favor of a reduction in sentence.  Upon considering all of the factors set forth in 18 U.S.C. § 3553(a), I conclude that Johnson's sentence shall be reduced to 324 months of imprisonment – the lower limit of his amended Guidelines range.

## CONCLUSION

Because the applicable amended range is lower than Johnson's original range, Johnson is eligible for a sentence modification under 18 U.S.C. § 3582(c)(2) and U.S.S.G. §

---

[11]  David Hamilton was another top-level supervisor, but he was granted leniency based on his substantial assistance to the government.

1B1.10. For the reasons explained above, his motion for a sentence reduction is granted, and his prison sentence is reduced to 324 months.

So ordered.

John Gleeson, U.S.D.J.

Dated: October 10, 2012
      Brooklyn, New York